## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

DEAN KANEKO, derivatively on behalf of
MICRON TECHNOLOGY, INC.,

        Plaintiff,

    v.

SANJAY MEHROTRA, DAVID A.
ZINSNER, ROBERT L. BAILEY, RICHARD
M. BEYER, PATRICK J. BYRNE,
MERCEDES JOHNSON, ERNEST E.
MADDOCK, LAURENCE N. MONDRY,
and ROBERT E. SWITZ,

        Defendants,

    -and-

MICRON TECHNOLOGY, INC.,

        Nominal Defendant.

Civil Action No.: _____

**DEMAND FOR JURY TRIAL**

## VERIFIED STOCKHOLDER DERIVATIVE COMPLAINT

Plaintiff Dean Kaneko ("Plaintiff"), by and through his undersigned counsel, derivatively

on behalf of nominal defendant Micron Technology, Inc. ("Micron" or the "Company"), submits

this Verified Stockholder Derivative Complaint against the Individual Defendants (defined herein)

as officers and/or directors of Micron for breaches of fiduciary duty, insider selling and

misappropriation of information, waste of corporate assets, and violations of Sections 10(b), 20(a),

and 20A of the Securities Exchange Act of 1934 (the "Exchange Act"). Plaintiff bases his

allegations on personal knowledge as to his own acts, and on information and belief as to all other

allegations, based upon investigation by counsel, including, but not limited to, a review and

analysis of: (i) regulatory filings made by Micron with the United States Securities and Exchange Commission ("SEC"); (ii) press releases issued and disseminated by Micron; (iii) multiple purported securities class action lawsuits filed in the United Stated District Court for the Southern District of New York against Micron and defendants Sanjay Mehrotra ("Mehrotra"), David A. Zinsner ("Zinsner"), and Ernest E. Maddock ("Maddock"), captioned *Kniffin v. Micron Technology, Inc., et al.*, Case 1:19-cv-00678 (S.D.N.Y.), *Rojvall v. Micron Technology, Inc., et al.*, Case 1:19-cv-00990 (S.D.N.Y.), and *Pokoik v. Micron Technology, Inc., et al.*, Case 1:19-cv-02136 (S.D.N.Y.), which have consolidated and captioned *In re Micron Technology, Inc. Securities Litigation*, Case No. 1:19-cv-000678 (S.D.N.Y.) (the "Securities Class Action"), alleging violations of the federal securities laws based on similar facts and circumstances as alleged herein; and (iv) other publicly-available information, including media and analyst reports, concerning Micron.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a stockholder derivative action that seeks to remedy wrongdoing committed by certain of Micron's officers and members of the Company's Board of Directors (the "Board"). Plaintiff seeks to remedy the Individual Defendants' violations of state and federal laws from September 26, 2017 through the present (the "Relevant Period") that have caused and continue to cause substantial monetary damages to Micron and other damages, including damages to its reputation and goodwill.

2. Micron is a holding company for subsidiaries engaged in the design and production of computers, semiconductors, and other related products. The subsidiaries produce many forms of semiconductor devices, including dynamic random-access memory ("DRAM"), flash memory,

USB flash drives, and solid-state drives.  Micron is one of the largest players in the DRAM market, along with Samsung Electronics Co., Ltd. ("Samsung") and SK Hynix, Inc. ("SK Hynix").

3.      During the Relevant Period, Micron reported strong revenue growth and profit margins due to the strength of its DRAM business and increasing DRAM product prices. Unbeknownst to investors, the strength of Micron's DRAM business was the result of collusive behavior among Micron and its main competitors, artificially increasing DRAM prices. Specifically, the three companies agreed to not increase DRAM product supply as prices increased, perpetuating an undersupply.  The collusive conduct caused DRAM prices to rise from mid-2016 through the end of 2017, inducing Micron customers to stockpile DRAM products to mitigate against the ever-rising prices.

4.      Due to the unprecedented prices, at the end of 2017, China's regulatory authorities began to investigate anticompetitive conduct in the industry.  As the investigation ramped up, the DRAM competitors increased capacity in 2018, leading to a moderating of prices and, in part, caused purchasers to cease stockpiling DRAM products.  Additionally, DRAM product demand began to soften.

5.      On November 19, 2018, *Financial Times* reported that Chinese investigators had found "massive evidence" of anti-competitive behavior by Samsung,   SK Hynix, and Micron.

6.      Specifically, the head of China's anti-monopoly bureau under the State Administration for Market Regulation, Wu Zhenguo, stated: "[t]he anti-monopoly investigation into these three companies has made important progress. . . .  [It] has yielded massive evidence."

7.      The same article reported that after steadily falling for the majority of the past three decades, the price-per-bit of DRAM chips suspiciously rose 47% in 2017, according to the American research firm IC Insights, and continued to increase in 2018.

8.      Kim Young-Woo, an analyst at SK Securities, said Beijing could impose fines of more than $2.5 billion on each of the three chipmakers in the worst-case scenario if they are found to have fixed prices.

9.      There is no way the Individual Defendants can credibly deny either knowing of or recklessly disregarding the monopoly scheme. China accounted for 51% of Micron's semiconductor sales in 2017.

10.      On this news, Micron's stock price fell almost 8%, closing at $36.12 on November 20, 2018.

11.      Throughout the Relevant Period, the Individual Defendants made materially false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors that:  (1) the Company engaged in anti-competitive behavior, including artificially restricting supply growth of DRAM; (2) these anti-competitive efforts were reasonably likely to lead to regulatory scrutiny; (3) the Company's anti-competitive efforts artificially boosted its operating metrics; (4) as a result, the Company's financial performance, including revenue, was overstated; and (5) as a result of the foregoing, the Individual Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

12.      As a direct and proximate result of the Individual Defendants' breaches of fiduciary duties and other misconduct, Micron has sustained damages as described below.

## JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Sections 10(b) and 20(a) of the Exchange Act (15

4

U.S.C. §§ 78j(b), 78t(a) and 78t-1), and SEC Rule 10b-5 (17 C.F.R. § 240.10b-5) promulgated thereunder.

14.    Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act.

15.    This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

16.    This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

17.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 1401 because Micron is incorporated in this District. In addition, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

18.    Plaintiff is a current stockholder of Micron common stock.    Plaintiff has continuously held Micron common stock at all relevant times.

19.    Micron is a Delaware corporation with its principal executive offices at 8000 South Federal Way, Boise, Idaho 83716.  Micron's shares trade on the NASDAQ Global Select Market ("NASDAQ-GS") under the ticker symbol "MU."

20.    Defendant Mehrotra is the Company's President, Chief Executive Officer ("CEO"), and a director.  He has been with the Company since May 2017 and is a member of the Finance Committee.  He is named as a defendant in the Securities Class Action.

21.    Defendant Zinsner is the Company's Chief Financial Officer ("CFO") and has held that position since February 2018.  He is a named as a defendant in the Securities Class Action.

22.     Defendant Maddock was the Company's CFO from June 2015 to February 2018. He is named as a defendant in the Securities Class Action.

23.     Defendant Robert L. Bailey ("Bailey") has been a member of the Company's Board since 2007.  He is a member of the Audit and Finance Committees.  Defendant Bailey sold the following shares with insider information regarding Micron's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Micron stock trading at artificially inflated prices at the time of his stock sales:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| October 2, 2017 | 3,000 | $ 39.86 | $ 119,580.00 |
| November 1, 2017 | 3,000 | $ 44.55 | $ 133,650.00 |
| December 1, 2017 | 3,000 | $ 41.50 | $ 124,500.00 |
| January 2, 2018 | 3,000 | $ 42.84 | $ 128,520.00 |
| February 1, 2018 | 3,000 | $ 43.14 | $ 129,420.00 |
| March 1, 2018 | 3,000 | $ 47.98 | $ 143,940.00 |
| April 2, 2018 | 3,000 | $ 50.74 | $ 152,220.00 |
| May 1, 2018 | 3,000 | $ 46.47 | $ 139,410.00 |
| June 1, 2018 | 3,000 | $ 58.38 | $ 175,140.00 |

24.     Defendant Richard M. Beyer ("Beyer") has been a member of the Company's Board since 2013.  He is a member of the Compensation and Governance and Sustainability Committees.

25.     Defendant Patrick J. Byrne ("Byrne") has been a member of the Company's Board since 2011.  He is a member of the Compensation and Audit Committees.  Defendant Byrne sold the following shares with insider information regarding Micron's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Micron stock trading at artificially inflated prices at the time of his stock sales:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| May 2, 2018 | 14,360 | $ 46.31 | $ 665,011.60 |

26.     Defendant Mercedes Johnson ("Johnson") was a member of the Company's Board from 2005 until her retirement in January 2019.  She served as Chair of the Audit Committee and Finance Committee.  Defendant Johnson sold the following shares with insider information regarding Micron's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Micron stock trading at artificially inflated prices at the time of her stock sales:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| April 2, 2018 | 25,000 | $ 50.50 | $ 1,262,500 |

27.     Defendant Lawrence N. Mondry ("Mondry") was a member of the Company's Board from 2005 until his retirement in January 2019.  He also served as Chair of the Compensation Committee and the Governance and Sustainability Committee.  Defendant Mondry sold the following shares with insider information regarding the Micron's market manipulation, false and misleading statements and lack of internal controls, all of which resulted in Micron stock trading at artificially inflated prices at the time of his stock sales:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| February 14, 2018 | 50,000 | $ 43.47 | $ 2,173,500 |

28.     Defendant Robert E. Switz ("Switz") has been a member of the Company's Board since 2006 and was appointed Chairman of the Board in 2012.  He is a member of the Compensation and Governance and Sustainability Committees.  Defendant Switz sold the following shares with insider information regarding Micron's market manipulation, false and misleading statements, and lack of internal controls, all of which resulted in Micron stock trading at artificially inflated prices at the time of his stock sales:

| Date | Number of Shares | Price | Proceeds |
|---|---|---|---|
| July 2, 2018 | 75,000 | $ 53.00 | $ 3,975,000.00 |

| July 13, 2018 | 25,000 | $ 56.00 | $ 1,400,000.00 |
|---|---|---|---|

29.    Defendants Bailey, Byrne, Johnson, Mondry, and Switz are sometimes referred to herein as the "Insider Selling Defendants."

30.    The defendants referenced above in ¶¶ 20-28 are sometimes referred to herein as the "Individual Defendants."

## DUTIES OF THE INDIVIDUAL DEFENDANTS

31.    By reason of their positions as officers and/or directors of the Company and because of their ability to control the corporate affairs and business of the Company, the Individual Defendants owed the Company and its stockholders fiduciary obligations of good faith, trust, loyalty, and due care, and were and are required to use their best efforts to control and manage the Company in a fair, just, honest, and equitable manner.  The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its stockholders so as to benefit all stockholders equally and not in furtherance of their personal interest or benefit.  Each director and officer of the Company owes to the Company and its stockholders the fiduciary duty to exercise good faith and diligence in the administration of the affairs of the Company and in the use and preservation of its property and assets, and the highest obligations of fair dealing.

32.    The Individual Defendants, because of their positions of control and authority as directors and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.

33.    In addition, as officers and/or directors of a publicly-held company, the Individual Defendants have a duty to promptly disseminate accurate and truthful information with regard to the Company's operations, performance, management, projections, and forecasts so that the market price of the Company's stock will be based on truthful and accurate information.

34.     To discharge their duties, the officers and directors of Micron were required to exercise reasonable and prudent supervision over the management, policies, practices, and controls of the Company.  By virtue of such duties, the officers and directors of Micron were required to, among other things:

a.     ensure that the Company complied with its legal obligations and requirements, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the SEC and the investing public;

b.     conduct the affairs of the Company in a lawful, efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

c.     properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results and prospects, and ensuring that the Company maintained an adequate system of financial controls such that the Company's financial reporting would be true and accurate at all times;

d.     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, make reasonable inquiry in connection therewith, and take steps to correct such conditions or practices and make such disclosures as necessary to comply with federal and state securities laws; and

e.     ensure that the Company was operated in a diligent, honest, and prudent manner in compliance with all applicable federal, state, and local laws, rules and regulations.

35.     Each of the Individual Defendants, as an executive officer and/or director, owed to the Company and to its stockholders the fiduciary duties of loyalty, good faith, and candor in the management and administration of the affairs of the Company, as well as in the use and preservation of its property and assets.  The conduct of the Individual Defendants complained of herein involves a knowing and culpable violation of their obligations as directors and officers of the Company, the absence of good faith on their part, and a reckless disregard for their duties to the Company and its stockholders that the Individual Defendants were aware or should have been aware posed a risk of serious injury to the Company.

9

36.      The Company also maintains a Code of Business Conduct and Ethics (the "Code").

The Code sets forth legal and ethical standards of conduct for directors, officers, employees, and

consultants of Micron and its subsidiaries.

37.      According to the Code, the employees and directors of Micron are responsible for

helping Micron maintain its good reputation and the trust and confidence of its stockholders, its

employees, the public, and those with whom Micron does business.

38.      Pursuant to the Code:

Our Code of Business Conduct and Ethics provides guidelines on how to act with integrity and make the right choices. All of us—officers, employees and directors— are accountable for knowing and employing the guidelines. No matter where at Micron we work or what our specific job might be, integrity always matters.

*      *      *

This Code applies to everyone who works on Micron's behalf worldwide, including team members (employees, officers and directors), temporary workers, vendors, suppliers and contractors. We are all expected to adhere to the standards contained in this Code. Any third parties we work with should also follow the standards outlined in this Code or their organization's own code of conduct and policies, if those principles are substantially similar. We should consult our Code for guidance if the right course of action is ever unclear.

At Micron, we've built a culture of integrity. Maintaining that culture is critical to our success.

39.      The Code goes on to state:

We strive to provide customers with a wide selection of goods at fair prices. To do this, we comply fully with fair competition laws of the U.S. and other countries where we do business. Fair competition laws ensure that businesses in the marketplace compete on the basis of quality and integrity—never by participating in unfair and anticompetitive practices such as price fixing, market, customer or supplier allocation, tying and bundling or any other agreement that would unfairly limit competition. Even if no written or oral agreement to violate these laws exists, an illegal agreement may still be inferred from our behavior. It is unacceptable to make agreements with our competitors to improperly restrain trade—or give the appearance that we have done so. To avoid even the appearance of impropriety, we should generally avoid discussing any of the following topics with our competitors:

• Pricing, credit terms or conditions of sale of products

10

- Plans regarding customers
- Pricing policies, bidding plans or strategies
- Marketing plans
- Restricting output, such as production volumes
- Discounts and promotions
- Dividing markets, territories (such as sales territories) or customers
- Inventories and capacity
- Whether or how to deal with a customer or supplier

We should obtain preapproval from the Legal Department before engaging in any of the following in our business conduct and communications, as they may be improper:

- Entering into collaborative arrangements with a competitor
- Establishing exclusive dealings
- Tying or bundling together different products
- Entering into "requirements" or exclusivity agreements
- Setting resale prices with resellers

We should also use caution when participating in trade association meetings or communicating through a trade association. If anyone attempts to discuss any of the topics listed above, we must immediately stop the discussion, leave the meeting and report it to the Legal Department. By making our objection to anticompetitive conversations clear and unmistakable, we can protect ourselves and our Company from accusations of anticompetitive activity.

*       *       *

To compete in the marketplace, we need to understand industry trends. This includes staying abreast of what our competitors are offering customers in the marketplace. However, we should only gather and use information about our competitors fairly, legally, and ethically. Generally, this means gathering such information only from publicly available sources, such as customers, public filings, news sources or industry surveys and reports.

We may never obtain non-public information through illegal activities, such as industrial espionage or asking a competitor's current or former employees or contractors to reveal confidential data. For example, we may never gather information from records brought by new hires from previous employers. In addition, we may not use information about competitive proposals or products that was given to a partner, supplier, customer or anyone else with the understanding they would treat it as confidential. Nor may we retain a third party to engage in such activities on our behalf.

Competition laws are complex, and issues can arise in many circumstances. Please review the *Antitrust Compliance Manual*, which is located on our Global Policy

11

Site (alias "policy"), for a more detailed explanation of the many laws and situations relevant to Micron team members.

\* \* \*

We are also firmly committed to preventing and detecting any act of fraud. Generally speaking, fraud is intentionally concealing facts in order to deceive or mislead others. Among other things, this may include:

- •Misstatements due to fraudulent financial reporting or revenue recognition
- •Misstatements related to using assets for illegal, inappropriate or unintended purposes (such as wire fraud or fictitious vendors)
- •Fraudulently obtained revenue and assets
- •Attempts to avoid costs and expenses

40. In addition, the Company's Audit Committee is specifically tasked with the Board's oversight responsibilities. The conduct of the Audit Committee is governed by the Audit Committee Charter (the "Charter").

41. Pursuant to the Charter:

The purpose of the Audit Committee of the Board of Directors (the "Board") of Micron Technology, Inc. (the "Company") shall be to:

1.01 Oversight and Monitoring. Assist the Board in overseeing and monitoring (a) the integrity of the Company's financial statements, (b) the Company's compliance with legal and regulatory requirements, (c) the independent auditor's qualifications and independence, and (d) the performance of the Company's internal audit function and of its independent auditors; and

1.02 Reporting. Prepare the report required by the Securities and Exchange Commission (the "SEC") to be included in the Company's annual proxy statement.

\* \* \*

In order to carry out the purpose described above, the Audit Committee may undertake those specific duties and responsibilities listed below and such other duties as the Board may from time to time prescribe.

4.02 Access. The Audit Committee shall enjoy full access to the Company's officers, employees and independent advisors as may be appropriate or necessary to carry out its responsibilities, subject to reasonable advance notice to the Company and reasonable efforts to avoid disruption to the Company's management, business and operations. To avoid disruption, such requests for access shall be coordinated through the Chairman of the Audit Committee.

12

4.03.01 The Audit Committee shall discuss with management and the independent auditors the annual audited financial statements and quarterly unaudited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations," prior to filing with the SEC the Company's Annual Report on Form 10-K and Quarterly Reports on Form 10-Q, respectively.

4.03.02 The Audit Committee shall discuss with management and the independent auditor significant financial reporting issues and judgments made in connection with the preparation of the Company's annual and quarterly financial statements, including any (a) significant changes in the Company's selection or application of accounting principles, (b) major issues as to the adequacy of the Company's internal controls, and (c) special steps adopted by the Company in light of identified material control deficiencies.

4.03.07 The Audit Committee shall review and discuss with management and the independent auditors the Company's Quarterly Reports on Form 10-Q and shall approve such quarterly reports prior to the filing of the report with the SEC.

4.06.01 The Audit Committee shall review at least quarterly the adequacy of the Company's system of internal controls, including meeting periodically with the Company's management, internal auditors (or the personnel responsible for the internal audit function) and the independent auditors.

4.06.02 The Audit Committee shall review periodically, with the Company's Chief Compliance Officer or his designee, the Company's compliance with legal and regulatory requirements. The Audit Committee may also discuss periodically with the Chief Compliance Officer or his delegate legal matters that may have a significant impact on the Company's financial statements.

4.06.03 The employee designated by the Chief Compliance Officer as having day-to-day operational responsibility for the Company's compliance and ethics program shall, no less than annually, provide to the Audit Committee an in-person briefing on the implementation and effectiveness of the compliance and ethics program.

4.06.04 The individual designated by the Chief Compliance Officer as having day-to-day operational responsibility for the Company's compliance and ethics program shall have express authority to report personally to the Audit Committee on any matter involving criminal conduct or potential criminal conduct.

4.06.05 The Audit Committee shall meet separately, periodically, with management, internal audit and the independent auditor.

4.06.06 The Audit Committee shall discuss guidelines and policies with respect to risk assessment and risk management and the steps management has taken to monitor and control such exposures, including exposure to major financial risk, it being understood that it is the job of management to assess and manage the Company's exposure to risk and that the Audit Committee's responsibility is to

discuss guidelines and policies by which risk assessment and management is undertaken.

4.06.08 The Audit Committee shall at least annually conduct a performance evaluation of the Audit Committee, including a review of this charter.

4.06.09 The Audit Committee shall establish procedures for: (a) the receipt, retention, and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters; and (b) the confidential, anonymous submission by employees of the Company of concerns regarding questionable accounting or auditing matters.

4.07.01 The Audit Committee shall report regularly to the Board regarding the Audit Committee's activities, examinations and recommendations, as may be appropriate and as are consistent with this Charter.

4.07.02 The Audit Committee shall report at least annually to the Board the Audit Committee's conclusions as to the independent auditors.

4.07.03 The Audit Committee shall report annually to the Company's shareholders by way of a report in the proxy statement prepared in accordance with the requirements of the rules and regulations of the SEC.

42.    In violation of the Audit Committee Charter, and their general duties as members of the Audit Committee, Defendants Bailey, Byrne, and Johnson who were members of the Audit Committee conducted little, if any, oversight of the Company's internal controls or the Company's compliance with legal and regulatory requirements resulting in materially false and misleading statements regarding the Company's business, operational, and compliance policies, and consciously disregarded their duties to monitor such controls over reporting.  The Audit Committee members' complete failure to perform their duties in good faith resulted in false misrepresentations to the SEC, the investing public, and the Company's stockholders.

43.    In addition, as executive officers and directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NASDAQ, the Individual Defendants had a duty not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth,

14

operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects, including false and misleading information about acquisitions, so that the market price of the Company's common stock would be based upon truthful and accurate information. Accordingly, the Individual Defendants breached their fiduciary duties by knowingly or recklessly causing Micron to make false and misleading statements of material fact about the Company's financials and about Micron's maintenance of adequate internal controls.

44.    Each of the Individual Defendants further owed to Micron and its stockholders the duty of loyalty requiring that each favor Micron's interest and that of its stockholders over their own while conducting the affairs the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

## SUBSTANTIVE ALLEGATIONS

### BACKGROUND

45.    Micron is an American global corporation based in Boise, Idaho and is a holding company for subsidiaries engaged in the design and production of computers, semiconductors, and other related products. Micron's subsidiaries produce many forms of semiconductor devices, including DRAM, flash memory, USB flash drives and solid-state drives. The Company markets its consumer products under the brands such as Crucial and Ballistix.

46.    Micron was founded in 1978 as a semiconductor design company. The Company grew significantly over the years as a result of a three-way merger, creation of two major joint ventures with Intel, and numerous acquisitions.

47.    Today, Micron has four operating segments: (1) the Compute and Networking Business Unit which sells memory products into the computer, networking, graphics, and cloud

15

server markets; (2) the Storage Business Unit which includes products sold into enterprise, client, cloud, and removable storage markets; (3) the Mobile Business Unit which sells memory products into the mobile-device markets; and (4) the Embedded Business Unit which includes memory products sold into the automotive, industrial, connected home, and consumer electronics markets.

48.    As of October 2018, Micron touted itself as "the touted world's fourth-largest semiconductor company, with the broadest portfolio of memory and storage solutions in the industry," employing over 34,000 people in 17 countries globally with nearly 40,000 patents contributed over the course of its 40-year history.

49.    Micron has manufacturing facilities in various locations with a significant portion located outside the U.S., including in China, Taiwan, Singapore, and Japan.  Micron also purchases a significant portion of its equipment and supplies from outside of the U.S. and many of its top customers are located outside the U.S.  For example, in 2018, 88% of Micron's sales were to customers located outside the U.S. and 57% of Micron's revenue was generated by China.

50.    Since Micron became a publicly traded company in 1990, it has acquired numerous other corporations that design, manufacture and sell semiconductor, memory, and flash products. Micron's acquisition strategy involved vertically integrating processes such as technology development, initial pilot line production, high-volume wafer manufacturing, and complex component assembly and test all in the same region.  Micron implemented its plan to monopolize the industry and grow sales through aggressively acquiring other large companies, including Chinese and Japanese companies such as Inotera, Elpida Memory, and Powerchip.

51.    The market for Micron's key product, DRAM, has become increasingly consolidated over the years.  The pool of DRAM suppliers shrunk from more than 20 in 1980 to just three—Micron, Samsung, and SK Hynix—in 2018. The three suppliers account for about 96%

of the market share.  It is very difficult for new entrants to penetrate the heavily consolidated DRAM market because its three main suppliers, Micron, Samsung, and SK Hynix, own the requisite intellectual property and DRAM development requires costly, large scale, specialized manufacturing processes. In addition, the market for DRAM is largely inelastic because there are no close substitutes for it.

52.     DRAM was crucial to Micron's business, making up approximately two-thirds of Micron's revenues. Micron heavily benefitted from the growing DRAM demand from the cloud, enterprise, mobile, and graphics end-markets.  During its fiscal year 2018, Micron reported that sales of its DRAM products rose 64%, with average selling prices rising by 35% and volumes growing 20%.

53.     DRAM is one of the most common forms of semiconductor memory.  DRAM stores bits of data in capacitors, which are situated within integrated circuits.  DRAM is widely incorporated in consumer electronics and industrial applications. The use of DRAM ranges from mobile phones and PCs to military and aviation devices.

54.     DRAM is classified into categories based on its end-use.  For example, PC DRAM is used in PC-related products; mobile DRAM is used in mobile devices; and server DRAM is used in server applications.

55.     Micron manufactures DRAM in fabrication plants, commonly called "fabs." DRAM is made from silicon wafers, which are cut into individual chips called "dice," which are then printed with electronics.  Capacity for DRAM is often discussed in terms of new "wafer starts."

56.     Micron sells the vast majority of DRAM to original equipment manufacturers ("OEMs"), which then incorporate DRAM into end-user products, such as PCs and mobile phones.

Micron primarily sells DRAM pursuant to contracts with DRAM buyers such as OEMs, with the remainder sold on the spot market.

57.     Micron is also increasingly reliant on its business in China.  The Company's revenue from Chinese customers rose 67% in 2018 and accounted for 57% of its total sales, compared to 51% in 2017 and 43% in 2016.

**MICRON'S ANTICOMPETITIVE CONDUCT**

### DRAM MARKET'S SUSCEPTIBILITY TO COLLUSION

58.     Over the years, the DRAM industry has become highly concentrated.  There were over 20 DRAM suppliers in 1980, but the number of suppliers almost halved by 2012.  The DRAM industry continued to consolidate in the past decade, further shrinking the pool to just three suppliers—Micron, Samsung, and SK Hynix, which collectively accounted for 96% of worldwide DRAM market share.  Micron by itself had a 23% market share, while Samsung had 46%, and SK Hynix had 27%.

59.     Intellectual property poses a formidable barrier to entry for new suppliers.  A number of patents, cross-licensed among Micron, Samsung, and SK Hynix, shields the dominating suppliers from new competitors.  Their partnerships and alliances for technology and capacity help secure their market power and render market entry more difficult.

60.     The three competitors also shared information through an industry reporting mechanism, DRAMeXchange, and common participation in trade associations and other industry groups.

61.     The rising prices between the middle of 2016 through the end of 2017 could not be explained by the primary types of costs, such as silicon wafer prices, research and development costs, and capital expenditures, which remained fairly stable.

62.     Nor was new development in DRAM technology responsible for price increases. The current DRAM technology, DDR4 was introduced in 2014 and was well into its life cycle, long before the price increases that began in the middle of 2016.

### COLLUSIVE CONDUCT BY MICRON, SAMSUNG, AND SK HYNIX

63.     In the DRAM industry, it was in the three main players' collective self-interest not to oversupply the market.  Each player had a huge financial motivation to get the other players not to add manufacturing capacity through sharing information with each other.

64.     Indeed, giving into the huge financial motivation, Micron had illegally colluded with other DRAM manufacturers in the past.  In 2005, the U.S. Department of Justice ("DOJ") brought a criminal case against Micron, Samsung, SK Hynix, and other DRAM manufacturers for fixing price of DRAM between April 1999 and June 2002.  Micron cooperated with DOJ by admitting that at least 31 of its executives and other employees had conspiratorial contacts with other DRAM manufacturers, earning immunity from prosecution.

65.     Micron's Senior Vice President of Marketing, Michael Sadler ("Sadler"), who was Micron's Chief Strategy Officer during the Relevant Period, testified that he participated in a "worldwide tour" to seek the cooperation of other manufacturers to restrict production.

66.     Micron also avoided payment of fines imposed by the European Commission ("EC") by being the first company to reveal the cartel to investigators and for its cooperation with the EC.

67.     About a decade after the DRAM price-fixing prosecution, global DRAM prices began rising again between June 2016 and December 2017 because supply grew well below demand.  According to DRAMeXchange, the average selling price of DRAM increased by more than 40% from the beginning to the end of 2017.  At the same time, Micron, Samsung, and SK

Hynix collectively restrained making the capital expenditures to expand supply capacity, instead focusing their investments on technology transitions and process optimizations.

68.    Data from DRAMeXchange shows that, during the same period, Micron's, Samsung's, and SK Hynix's operating margins increased to 50-70%, the highest levels on record. The profitability of DRAM increased so much that it exceeded that of application processors, a special kind of microprocessor that is more technically advanced than DRAM.

69.    Prior to the increasing prices of DRAM between the middle of 2016 and the end of 2017, Micron, Samsung, and SK Hynix had not limited their capacity expansion to the extent that supply increased more slowly than demand.  As shown by their public statements throughout this period, the three competitors signaled their joint agreement to limit capacity expansion, which caused DRAM spot prices to skyrocket nearly 350%.

70.    While DRAM prices increased in 2017, Micron, Samsung, and SK Hynix kept their supply growth below the forecasted demand growth and avoided competing against each other for market share.

71.    According to an earnings call held on June 29, 2017, the Company stated that the total DRAM bit growth "would be between 15-20%," which was below its view of demand growth. Samsung and SK Hynix subsequently made similar statements that supply growth would be lower than demand growth.

72.    Defendant Mehrotra reiterated the Company's view during an investor conference held on August 7, 2017 that industrywide DRAM supply would grow in the 15-20% range, as compared to demand growth exceeding 20%.

73.    During an earnings call held on September on September 27, 2017, defendant Mehrotra stated, "we intend to grow aligned with industry over the course of these multiyear periods." Samsung and SK Hynix subsequently made similar statements around this time.

74.    Due to Micron's, Samsung's, and SK Hynix's collusive conduct, the price-per-bit of DRAM chips rose 47% in 2017 following a three-decade price decline. As the three companies entered 2018, they sought to keep DRAM prices high by limiting supply. Indeed, according to TrendForce, wafer start volumes for the three companies was expected to expand only 5-7% in 2018.

### CHINA'S INVESTIGATION

75.    As it grew into an electronics manufacturing powerhouse, China became one of the largest consumers of DRAM in the world.  For example, China is the largest smartphone manufacturer in the world and consumes approximately 20% of the world's DRAM.  As a result, Chinese OEMs were among the most negatively impacted by the DRAM price hikes because they operated at lower profit margins compared to their competitors.

76.    Following the harsh impact on Chinese smartphone manufacturers due to rising DRAM prices, on December 22, 2017, China's National Development and Reform Commission ("NDRC") expressed concerns to Samsung about Samsung's role in the continuing price increases for memory products.

77.    On December 26, 2017, *Reuters* reported that "China's economic regulator is paying close attention to a recent surge in the price of mobile phone storage chips and could look into possible price fixing by the firms that make them[.]"  Xu Xinyu, an official with the NDRC Pricing Supervision Department, was quoted in the state-run *China Daily* newspaper as saying that, "We have noticed the price surge and will pay more attention to future problems that may be caused by 'price fixing' in the sector."  According to the *China Daily*, "the official referred to

21

possible coordinated action taken by a number of firms to gain maximum profits by pushing the price of the product as high as possible."

78.     In addition, China's State Administration for Market Regulation ("SAMR") began investigating Micron's involvement in rising DRAM prices.  After an initial round of interviews and discussions between Micron and SAMR, the Company agreed to reduce its prices as requested.

79.     Prices continued to increase, however. Micron's failure to deliver on its promise, combined with Micron's uncooperative and arrogant attitude, angered SAMR and led to its raid of the Company in May 2018.  The Company's senior management was aware of this development.

80.     In June 2018, it was reported that China had launched a probe into Micron, Samsung, and SK Hynix, specifically investigating price-fixing allegations.  On June 1, 2018, Micron issued a statement "confirm[ing] that China's State Administration for Market Regulation authorities visited Micron's China sales offices on May 31, 2018 seeking certain information." Samsung and SK Hynix also confirmed that the regulator had visited their offices.

81.     As was reported at the end of the Relevant Period, there was massive evidence that Micron and its supposed competitors were engaging in anticompetitive conduct to artificially inflate DRAM prices.

82.     Micron faces potential fines from the Chinese government up to 10% of its annual sales in China due to its anticompetitive conduct.

**IMPACT OF CHINA'S INVESTIGATION**

83.     The steep ascent of DRAM prices abruptly stopped as China's investigation began in earnest in early 2018.

84.     When prices rise, customers usually purchase more inventory than they need, and when they start to expect prices to go down, customers will cut back on the purchases to bleed off the excess inventory.

85.    Throughout 2017, based on consistent reports, OEMs were concerned about a worldwide shortage of memory products caused by Micron's, Samsung's, and SK Hynix's inability or unwillingness to keep up with growing demand of memory products.

86.    According to DRAMeXchange, beginning in the third quarter of 2017, OEMs, especially server manufacturers, had been amassing memory products due to rising prices of DRAM.  Likewise, Chinese PC and server manufacturers began stockpiling memory products to mitigate their exposure to rising DRAM prices.

87.    Micron, Samsung, and SK Hynix were unwilling to keep up with the demand until China began to investigate anticompetitive conduct.  Their manufacturing strategy shifted swiftly in May 2018 when SAMR regulators raided Micron.  It was reported that Samsung and SK Hynix were investing more than $35 billion to increase their memory manufacturing capacities.

**WEAKENING DEMAND IN 2018**

88.    Following this development, industry analysts forecasted that the supply shortage would begin to subside in the second half of 2018.

89.    In the first half of 2018, while DRAM contract prices continued to rise, spot prices began to fall.  Beginning in June 2018, spot prices started to fall below contract prices, indicating that DRAM prices would decline overall.

90.    Beginning around the second half of 2018, coupled with the expected rising supply capacity, demand for memory products started to slow down, indicating that the DRAM market would go from shortage to oversupply.

91.    As DRAMeXchange stated in September 2018, "[a]lthough end-product manufacturers as a whole are seeing a gradual drop in their DRAM inventories after posting shipment growths in this year's first half, they are also noticing that the supply situation in the

23

DRAM market is shifting from tight to loose." Consequently, equipment manufacturers did not see any urgency to replenish their DRAM inventory as supply expanded.

92. After price growth for nine consecutive quarters, DRAM prices began to weaken in the third quarter of 2018.

93. Internally, the Individual Defendants knew that the market demand for DRAM products was weakening. In addition to coverage from industry analysts, Micron was receiving demand data from its own customers, which indicated that the market was softening in 2018. Micron's large customers provided information regarding their inventories and projected inventories. Many of Micron's large customers even submitted internal forecasts on a monthly basis to Micron.

94. In particular, China's regulatory actions halted the collusive behavior of Micron, Samsung, and SK Hynix, leading to expanding capacity and moderating prices. Given the outlook of moderating or even declining prices, Micron's customers no longer saw the need to accumulate DRAM inventory.

95. The industry suddenly had a global glut of DRAM products.

**THE INDIVIDUAL DEFENDANTS CAUSE THE COMPANY TO ISSUE MATERIALLY FALSE AND MISLEADING STATEMENTS DURING THE RELEVANT PERIOD**

96. On September 26, 2017, the Company announced its fourth quarter and full year 2017 financial results. For the full year, it reported revenue of $20.32 billion and net income of $5.09 billion.

97. On October 26, 2017, the Company filed its annual report on Form 10-K for the period ended August 31, 2017 (the "2017 10-K"). Under "Risk Factors," the 2017 10-K stated in relevant part:

**The semiconductor memory and storage markets are highly competitive.**

24

> We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology their products could have cost or performance advantages. ***The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.***

(Emphasis added).

98.    On December 19, 2017, the Company announced its first quarter 2018 financial results and reported revenue of $6.803 billion and net income of $2.67 billion.

99.    On December 20, 2017, the Company filed its quarterly report on Form 10-Q for the period ended November 30, 2017 (the "1Q 2018 10-Q"). Under "Risk Factors," the 1Q 2018 10-Q stated in relevant part:

> **The semiconductor memory and storage markets are highly competitive.**
>
> We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of

industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages. ***The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.***

(Emphasis added).

100.    On March 22, 2018, the Company announced its second quarter 2018 financial results and reported revenue of $7.351 billion and net income of $3.309 billion.

101.    On March 23, 2018, the Company filed its quarterly report on Form 10-Q for the period ended March 1, 2018 (the "2Q 2018 10-Q"). Under "Risk Factors," the 2Q 2018 10-Q stated in relevant part:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments, such as China, have provided, and may continue to provide, significant financial assistance to some of our competitors or to new entrants. Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply

of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages. ***The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.***

(Emphasis added).

102.    On May 25, 2018, media reported that Chinese regulators had launched an investigation into Micron for DRAM price increases and abuse of its dominant market position.

103.    On June 20, 2018, the Company announced its third quarter 2018 financial results and reported revenue of $7.797 billion and net income of $3.823 billion.

104.    On June 22, 2018, the Company filed its quarterly report on Form 10-Q for the period ended May 31, 2018 (the "3Q 2018 10-Q"). Under "Risk Factors," the 3Q 2018 10-Q stated in relevant part:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided, and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. The activities by the Chinese government may restrict us from

27

participating in the China market or may prevent us from competing effectively with Chinese companies.

Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

***The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.***

(Emphasis added).

105.    On September 20, 2018, the Company announced its fourth quarter and full year 2018 financial results.  For the full year, it reported revenue of $30.391 billion and net income of $14.135 billion.

106.    On October 15, 2018, the Company filed its annual report on Form 10-K for the period ended August 30, 2018 (the "2018 10-K").  Under "Risk Factors," the 2018 10-K stated in relevant part:

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Intel; Samsung Electronics Co., Ltd.; SK Hynix Inc.; Toshiba Memory Corporation; and Western Digital Corporation. Some of our competitors are large corporations or conglomerates that may have greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage. In addition, some governments have provided, and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may

intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities that is intended to advance China's stated national policy objectives. In addition, the Chinese government may restrict us from participating in the China market or may prevent us from competing effectively with Chinese companies.

Our competitors generally seek to increase silicon capacity, improve yields, and reduce die size in their product designs which may result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We and some of our competitors have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, would lead to further declines in average selling prices for our products and would materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

***The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.***

(Emphasis added).

107.    The above statements identified in ¶¶ 96-106 were materially false and/or misleading, and failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Individual Defendants failed to disclose to investors:  (1) that the Company engaged in anti-competitive behavior, including artificially restricting supply growth of DRAM; (2) that these anti-competitive efforts were reasonably likely to lead to regulatory scrutiny; (3) that the Company's anti-competitive efforts artificially boosted its operating metrics; (4) that, as a result, the Company's financial performance, including revenue, was overstated; and (5) that, as a result of the foregoing, the Individual Defendants' positive statements about the

29

Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis.

**THE TRUTH IS REVEALED**

108. On November 19, 2018, *Financial Times* reported that Chinese investigators said they had found "'massive evidence' of anti-competitive behavior" by Micron and two other companies, Samsung and SK Hynix. These are the two companies that the Individual Defendants repeatedly represented Micron was competing against in the semiconductor memory and storage markets, and the two companies that Micron shares 96.4% of the DRAM chip manufacturing market.

109. On this news, the Company's share price fell $2.61 per share, nearly 7%, to close at $36.83 per share on November 19, 2018, on unusually heavy trading volume.

**SHARE REPURCHASES**

110. During the Relevant Period, during which the Individual Defendants caused the Company to partake in anti-competitive behavior and make materially false and misleading statements and omissions, the Individual Defendants also caused the Company to repurchase its common stock at artificially inflated prices which substantially damaged the Company. In total, the Company spent an aggregate amount of over $1.9 billion to repurchase 44.59 million shares of its own common stock at artificially inflated prices from May 4, 2018 through November 29, 2018.

111. As the Company stock was actually only worth $36.12 per share, the price at closing on November 20, 2018, the Company overpaid approximately $308 million in total for these repurchases.

112. According to the 3Q 2018 10-Q, between May 4, 2018 and May 31, 2018, the Individual Defendants caused the Company to repurchase 2,185,755 shares of its own common

stock at an average price per share of approximately $52.95, for a total cost to the Company of approximately $115.7 million.

113.   Per the 3Q 2018 10-Q, the following shares were repurchased:

| Period | | (a) Total number of shares purchased | (b) Average price paid per share |
|---|---|---|---|
| March 2, 2018 | April 5, – 2018 | — | $— |
| April 6, 2018 | May 3, – 2018 | — | $— |
| May 4, 2018 | May 31, – 2018 | 2,185,755 | $52.95 |
| | | 2,185,755 | $52.95 |

114.   Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $16.83 more than the actual worth of each share between May 4, 2018 and May 31, 2018.  Thus, the total overpayment by the Company for repurchases of its own stock between May 1, 2018 and May 31, 2018 was over $36.7 million.

115.   According to the Form 10-Q filed by the Company on December 19, 2018 ("1Q 2019 10-Q") the Company repurchased shares throughout the Company's first fiscal quarter:

In May 2018, we announced that our Board of Directors had authorized the discretionary repurchase of up to $10 billion of our outstanding common stock beginning in 2019. We may purchase shares on a discretionary basis through open-market purchases, block trades, privately-negotiated transactions, and/or derivative transactions, subject to market conditions and our ongoing determination of the best use of available cash. The repurchase authorization does not obligate us to acquire any common stock. In the first quarter of 2019, we repurchased an aggregate of 42 million shares of our common stock for $1.80 billion under an accelerated share repurchase agreement, Rule 10b5-1 plans, and through open market repurchases. The shares were recorded as treasury stock.

116.   Per the 1Q 2019 10-Q, the repurchases were as follows:

| Period | (a) Total number of | (b) Average price paid per | (c) Total number of shares (or units) purchased as part of |
|---|---|---|---|

| | shares purchased | share | publicly announced plans or programs |
|---|---|---|---|
| August 31, 2018 – October 4, 2018 | 25,691,192 | $43.39 | 25,691,192 |
| October 5, 2018 – November 1, 2018 | 11,494,319 | $41.42 | 11,494,319 |
| November 2, 2018 – November 29, 2018 | 5,220,139 | $40.78 | 5,220,139 |
| | 42,405,650 | | |

117.    The news of Micron's market manipulation broke on November 19, 2018, ensuring that the Company bought a minimum of 37,185,511 shares at artificially inflated prices. However, in all likelihood a majority of the share repurchases occurring between November 2, 2018 and November 29, 2018 also occurred at artificially inflated prices. The "average price paid per share" during that time period was $40.78. Micron's share price fell to $36.12 per share on November 20, 2018 and never raised above $38.71 during the final repurchase period.

118.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $7.27 more than the actual worth of each share between August 31, 2018 and October 4, 2018. Thus, the total overpayment by the Company for repurchases of its own stock between August 31, 2018 and October 4, 2018 was over $186.7 million.

119.    According to the Company's 1Q 2019 10-Q, between October 5, 2018 and November 1, 2018, the Individual Defendants caused the Company to repurchase 11,494,319 shares of its own common stock at an average price per share of approximately $41.42, for a total cost to the Company of approximately $476 million.

120.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $5.30 more than the actual worth of each share between October 5, 2018 and

November 1, 2018.  Thus, the total overpayment by the Company for repurchases of its own stock between October 5, 2018 and November 1, 2018 was over $60.9 million.

121.    According to the Company's 1Q 2019 10-Q, between November 2, 2018 and November 29, 2018, the Individual Defendants caused the Company to repurchase 5,220,139 shares of its own common stock at an average price per share of approximately $40.78, for a total cost to the Company of approximately $212.8 million.  Upon information and belief, at least some of these repurchases were made while the price of the Company's shares was artificially inflated due to the false and misleading statements discussed herein.

122.    Due to the artificial inflation of the Company's stock price caused by misrepresentations made and/or caused to be made by the Individual Defendants, the Company paid on average $4.66 more than the actual worth of each share between November 2, 2018 and November 29, 2018.  Thus, the total overpayment by the Company for repurchases of its own stock between November 2, 2018 and November 29, 2018 was over $24.3 million.

123.    In total, the Company overpaid an aggregate amount of approximately $308 million for repurchases of its own stock during the period in which the Company made false and misleading statements and omissions.

**INSIDER SELLING**

124.    While in possession of knowledge that Micron had engaged in anti-competitive behavior in violation of U.S. and Chinese law, defendants Bailey, Byrne, Johnson, Mondry, and Switz (collectively, the "Insider Selling Defendants") sold large quantities of their personal holdings of Micron shares at inflated prices totaling over $7.769 million before the truth came to light.

125. Defendant Bailey is a member of Micron's Board and Audit and Governance and Sustainability Committees. Bailey was aware of material, adverse, and non-public information regarding Micron's business practices and the Company's statements related thereto. While in possession of this information, Bailey sold 9,000 shares of Micron stock between April 2, 2018 and June 1, 2018, at artificially inflated prices, for total proceeds of approximately $466,770.

126. Defendant Byrne is a member of Micron's Board and Audit and Compensation Committees. Byrne was aware of material, adverse, and non-public information regarding Micron's business practices and the Company's statements related thereto. While in possession of this information, Byrne sold 14,360 shares of Micron stock on May 2, 2018, at artificially inflated prices, for total proceeds of over $665 thousand.

127. Defendant Johnson was a member of Micron's Board until January 2019. Johnson was aware of material, adverse, and non-public information regarding Micron's business practices and the Company's statements related thereto. While in possession of this information, Johnson sold 25,000 shares of Micron stock on April 2, 2018, at artificially inflated prices, for total proceeds of over $1.26 million.

128. Defendant Mondry was a member of Micron's Board until December 2018. Mondry was aware of material, adverse, and non-public information regarding Micron's business practices and the Company's statements related thereto. While in possession of this information, Mondry sold 50,000 shares of Micron stock on February 14, 2018, at artificially inflated prices, for total proceeds of over $2.1 million.

129. Defendant Switz is Micron's Board Chairman. Switz was aware of material, adverse, and non-public information regarding Micron's business practices and the Company's statements related thereto. While in possession of this information, Switz sold 100,000 shares of

Micron stock between July 2, 2018 and July 13, 2018, at artificially inflated prices, for total proceeds of over $5.37 million.

130.  These insider sales total over $9.8 million in proceeds and were all executed while Micron's stock price was artificially inflated due to the unlawful conduct alleged herein.  Further, Micron was a contemporaneous purchaser of Micron securities and was directly harmed by the Insider Selling Defendants' unlawful stock sales.

## DAMAGES TO THE COMPANY

131.  As a result of the Individual Defendants' wrongful conduct, Micron disseminated false and misleading statements and omitted material information to make such statements not false and misleading when made.  The improper statements have devastated Micron's credibility. Micron has been, and will continue to be, severely damaged and injured by the Individual Defendants' misconduct.

132.  Moreover, the actions of the Individual Defendants in directing Micron to undertake wrongful "anti-competitive behavior" have exposed Micron to enormous damages from the Chinese government and are not protected by the business judgment rule.

133.  Furthermore, aside from ruining the Company's reputation for honesty, integrity, and aptitude, the Individual Defendants have exposed the Company to very expensive legal costs to defend, investigate, and pay judgment or settlement in the Securities Class Action in addition to massive fines from Chinese regulators regarding the Company's anti-competitive behavior.

134.  As a direct and proximate result of the Individual Defendants' actions as alleged above, Micron's market capitalization has been substantially damaged, losing millions of dollars in value as a result of the conduct described herein.

135.    Moreover, these actions have irreparably damaged Micron's corporate image and goodwill.  For at least the foreseeable future, Micron will suffer from what is known as the "liar's discount," a term applied to the stocks of companies who have been implicated in illegal behavior and have misled the investing public, such that Micron's ability to raise equity capital or debt on favorable terms in the future is now impaired.

136.    Finally, the Individual Defendants have caused the Company to waste almost two billion dollars buying back its own shares at artificially inflated prices.

## **DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS**

137.    Plaintiff incorporates the allegations herein by reference.

138.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties and other violations of the law.

139.    Plaintiff is a stockholder of Micron, was a stockholder of Micron at the time of the wrongdoing alleged herein, and has been a stockholder of Micron continuously since that time.

140.    Plaintiff will adequately and fairly represent the interests of the Company and its stockholders in enforcing and prosecuting its rights.

141.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Micron Board to institute this action against the Individual Defendants.  Such a demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

142.    At the time of the filing of this complaint, the Micron Board consists of the following eight individuals:  Defendants Bailey, Beyer, Byrne, Mehrotra, and Switz (the "Director

36

Defendants"), and non-defendants Steve Gomo ("Gomo"), Mary Pat McCarthy, and MaryAnn Wright.

143.    As a result of the facts set forth herein, Plaintiff has not made any demand on the Micron Board to institute this action against the Individual Defendants.  Such a demand would have been a futile and useless act with respect to each and every one of the Director Defendants and non-defendant Gomo because they are incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

**DEMAND IS FUTILE AS TO ALL DIRECTOR DEFENDANTS BECAUSE THEY EACH FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

144.    The Director Defendants all face a substantial likelihood of liability for their individual misconduct.  The Director Defendants were directors throughout the time of the false and misleading statements, and as such had a fiduciary duty to ensure that the Company's SEC filings, press releases, and other public statements and presentations on behalf of the Company concerning its business, operations, prospects, internal controls, and financial statements were accurate.

145.    Moreover, as directors, the Director Defendants owed a duty to, in good faith and with due diligence, exercise reasonable inquiry, oversight, and supervision to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and to ensure that the Board's duties were being discharged in good faith and with the required diligence and due care.  Instead, they knowingly and/or with reckless disregard allowed Micron to partake in wrongful anti-competitive behavior and reviewed, authorized, and/or caused the publication of the materially false and misleading statements discussed above that caused the Company's stock to trade at artificially inflated prices.

146.    The Director Defendants knowingly and/or recklessly allowed Micron to partake in anti-competitive behavior, made or authorized false and misleading statements, failed to timely correct such statements, failed to take necessary and appropriate steps to ensure that the Company's internal controls were sufficiently robust and effective (and were being implemented effectively), and failed to take necessary and appropriate steps to ensure that the Board's duties were being discharged in good faith and with the required diligence.  These actions constitute breaches of the fiduciary duties of loyalty and good faith, for which the Director Defendants face a substantial likelihood of liability.  If the Director Defendants were to bring a suit on behalf of Micron to recover damages sustained as a result of this misconduct, they would expose themselves to significant liability.  This is something they will not do.  For this reason, demand is futile as to the Director Defendants.

**DEMAND IS EXCUSED AS TO DEFENDANTS BAILEY, BYRNE, AND SWITZ BECAUSE THEY FINANCIALLY BENEFITED FROM THE FALSE AND MISLEADING STATEMENTS**

147.    As noted above, Bailey, Byrne, and Switz personally benefited from Micron's anti-competitive behavior and the materially false and misleading statements made by the Individual Defendants by having an opportunity to sell shares of Micron stock at artificially inflated prices, a benefit not shared by Micron's public stockholders.  Accordingly, demand is futile as to Bailey, Byrne, and Switz.

**DEFENDANT MEHROTRA LACKS INDEPENDENCE**

148.    Mehrotra is not disinterested for purposes of demand futility because his principal occupation is serving as Micron's President and CEO.  As such, the Company's December 6, 2018 proxy statement filed with the SEC explicitly states that Mehrotra is not independent.  Further, according to the Company's SEC filings, in 2017 and 2018, Mehrotra received total compensation of $15,373,026 and $14,241,583, respectively.  This amount is material to him.

149.    Further, Mehrotra is incapable of considering a demand to commence and vigorously prosecute this action because he faces additional substantial likelihood of liability as he is a named defendant in the Securities Class Action.

**GOMO LACKS INDEPENDENCE**

150.    Defendant Mehrotra led SanDisk Corporation from a start-up in 1998 to sale in 2016, serving as President and CEO of SanDisk from 2011 to 2016 and non-defendant Steve Gomo served as a director at SanDisk from December 2005 until its sale in 2016.  This interpersonal or business connection renders Gomo incapable of independently or fairly considering the claims against Mehrotra alleged herein.

151.    In addition, Gomo and defendant Byrne were both employed at Hewlett Packard from 1983 through 1998, serving in key financial and general management positions.  Thus, Gomo is incapable of independently prosecuting claims against defendant Byrne due to their business affiliation.

**DEFENDANT BEYER LACKS INDEPENDENCE**

152.    Defendant Beyer was on the board at Analog Devices Inc ("Analog") from 2013 until 2017, Micron's CFO – defendant Zinsner – was the CFO at Analog from November 2014 to March 2017 and Analog's Vice President of Finance from 2009 to 2014.  Beyer was CEO and a director of Intersil Corp. from 2002 to 2008 and Zinsner was CFO at Intersil from 2005 to 2008.  Therefore, due to these business affiliations with defendant Zinsner, defendant Beyer is incapable of independently considering the claims alleged herein.

**DEMAND IS EXCUSED AS TO DEFENDANTS BAILEY AND BYRNE BECAUSE AS MEMBERS OF THE AUDIT COMMITTEE THEY FACE A SUBSTANTIAL LIKELIHOOD OF LIABILITY**

153.    As members of the Audit Committee during the Relevant Period, defendants Bailey and Byrne participated in and knowingly approved Micron's anti-competitive behavior and filing

of false financial statements and allowed the Individual Defendants to repeatedly make other false and misleading statements to the investing public.  More specifically, as members of the Audit Committee, Bailey and Byrne were obligated to oversee and monitor (a) the integrity of the Company's financial statements, and (b) the Company's compliance with legal and regulatory requirements.  Instead, Bailey and Byrne, as members of the Audit Committee, failed to ensure the integrity of the Company's financial statements and financial reporting process, the Company's systems of internal accounting and financial controls and compliance with legal and regulatory requirements, as required by the Audit Committee Charter.  For this reason, demand is futile as to Bailey and Byrne.

## COUNT I
### BREACH OF FIDUCIARY DUTY
**(Against the Individual Defendants)**

154.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

155.    Each of the Individual Defendants owed to the Company the duty to exercise candor, good faith, and loyalty in the management and administration of Micron's business and affairs.

156.    Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

157.    The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of the fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of Micron.

158.    In breach of their fiduciary duties, the Individual Defendants failed to maintain an adequate system of oversight, disclosure controls and procedures, and internal controls.

159. The Individual Defendants also breached their fiduciary duties by causing the Company to engage in the anti-competitive behavior in violation of U.S. and Chinese law.

160. In addition, the Individual Defendants further breached their fiduciary duties owed to Micron by willfully or recklessly making and/or causing the Company to make false and misleading statements and omissions of material fact that failed to disclose, *inter alia*, that: (1) that the Company engaged in anti-competitive behavior, including artificially restricting supply growth of DRAM; (2) that these anti-competitive efforts were reasonably likely to lead to regulatory scrutiny; (3) that the Company's anti-competitive efforts artificially boosted its operating metrics; (4) that, as a result, the Company's financial performance, including revenue, was overstated; (5) that, as a result of the foregoing, Defendants' positive statements about the Company's business, operations, and prospects were materially misleading and/or lacked a reasonable basis; and (6) the Company failed to maintain internal controls. As a result of the foregoing, the Company's public statements were materially false and misleading at all relevant times.

161. The Individual Defendants failed to correct and caused the Company to fail to rectify any of the wrongs described herein or correct the false and misleading statements and omissions of material fact referenced herein, rendering them personally liable to the Company for breaching their fiduciary duties.

162. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent scheme set forth herein and to fail to maintain adequate internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent scheme set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent scheme and to fail to maintain adequate internal

41

controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of the Company's securities and engaging in insider sales. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

163. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

164. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations, Micron has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

165. Plaintiff on behalf of Micron has no adequate remedy at law.

## COUNT II
### VIOLATIONS OF SECTION 10(B) AND RULE 10B-5 OF THE EXCHANGE ACT
### (Against the Individual Defendants)

166. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

167. During the Relevant Period, in connection with Micron's repurchases of Micron shares, the Individual Defendants disseminated or approved false or misleading statements about Micron specified in ¶¶ 44-54, which they knew or recklessly disregarded were false or misleading and were intended to deceive, manipulate, or defraud. Those false or misleading statements and the Individual Defendants' course of conduct were designed to artificially inflate the price of the Company's common stock.

168. At the same time that the price of the Company's common stock was inflated due to the false or misleading statements made by the Individual Defendants, the Individual Defendants caused the Company to repurchase millions of shares of its own common stock at prices that were

artificially inflated due to the Individual Defendants' false or misleading statements. The Individual Defendants engaged in a scheme to defraud Micron by causing the Company to purchase over $1.9 billion in shares of Micron stock at artificially inflated prices.

169. The Individual Defendants violated Section 10(b) of the Exchange Act and SEC Rule 10b-5 in that they (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Micron in connection with the Company's purchases of Micron stock during the Relevant Period.

170. The Individual Defendants, individually and in concert, directly and indirectly, by the use of means or instrumentalities of interstate commerce or of the mails, engaged and participated in a continuous course of conduct that operated as a fraud and deceit upon the Company; made various false or misleading statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; made the above statements intentionally or with a severely reckless disregard for the truth; and employed devices and artifices to defraud in connection with the purchase and sale of Micron stock, which were intended to, and did, (a) deceive Micron regarding, among other things, the anti-competitive behavior undertaken by the Individual Defendants, the Company's internal controls and compensation practices, and the Company's financial statements; (b) artificially inflate and maintain the market price of Micron stock; and (c) cause Micron to purchase the Company's stock at artificially-inflated prices and suffer losses when the true facts became known. Throughout the Relevant Period, the Individual Defendants

43

were in possession of material, adverse non-public information regarding the anti-competitive behavior.

171.   The Individual Defendants were among the senior management and the directors of the Company, and were therefore directly responsible for, and are liable for, all materially false or misleading statements made during the Relevant Period, as alleged above.

172.   As described above, the Individual Defendants acted with scienter throughout the Relevant Period, in that they acted either with intent to deceive, manipulate, or defraud, or with severe recklessness.  The misstatements and omissions of material facts set forth in this Complaint were either known to the Individual Defendants or were so obvious that the Individual Defendants should have been aware of them.  Throughout the Relevant Period, the Individual Defendants also had a duty to disclose new information that came to their attention and rendered their prior statements to the market materially false or misleading.

173.   The Individual Defendants' false or misleading statements and omissions were made in connection with the purchase or sale of the Company's stock, both by the Company itself and by the Insider Selling Defendants.

174.   As a result of the Individual Defendants' misconduct, Micron has and will suffer damages in that it paid artificially inflated prices for Micron common stock purchased as part of the repurchase program and suffered losses when the previously undisclosed facts relating to the anti-competitive behavior were disclosed in November 2018.  Micron would not have purchased these securities at the prices it paid, or at all, but for the artificial inflation in the Company's stock price caused by Defendants' false or misleading statements.

175.   As a direct and proximate result of the Individual Defendants' wrongful conduct, the Company suffered damages in connection with its purchases of Micron stock during the

44

Relevant Period.  By reason of such conduct, the Individual Defendants are liable to the Company pursuant to Section 10(b) of the Exchange Act and SEC Rule 10b-5.

176.   Plaintiff brought this claim within two years of his discovery of the facts constituting the violation and within five years of the violation.

## COUNT III
### VIOLATIONS OF SECTION 20(A) OF THE EXCHANGE ACT
### (Against Individual Defendants)

177.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

178.   The Individual Defendants, by virtue of their positions with Micron and their specific acts, were, at the time of the wrongs alleged herein, controlling persons of Micron and each of its officers and directors who made the false and misleading statements alleged herein with the meaning of section 20(a) of the Exchange Act.  The Individual Defendants had the power and influence and exercised the same to cause Micron to engage in the wrongful conduct and practices complained of herein.

179.   Plaintiff, on behalf of Micron, has no adequate remedy at law.

## COUNT IV
### VIOLATIONS OF SECTION 20A OF THE EXCHANGE ACT
### (Against Insider Selling Defendants)

180.   Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

181.   The Insider Selling Defendants, by reason of their relationship with the Company as officers and directors of the Company, had access, directly or indirectly, to material information about the Company not available to the public.

182.   The Insider Selling Defendants knowingly traded on this material, non-public information about the Company.

183.   The Insider Selling Defendants sold Micron securities with actual knowledge that the value of these securities was inflated as a result of the Individual Defendants' false and misleading statements and other fraudulent activities detailed in this Complaint.

184.   As part of Micron's publicly disclosed share repurchase program, the Company purchased over 44.59 million shares of its common stock throughout the Relevant Period. Micron was a contemporaneous purchaser of Micron securities, pursuant to Section 20A of the Exchange Act, when the Insider Selling Defendants sold Micron securities, as set forth in the charts in ¶¶ 23, 25, 26, 27, and 28 above.

185.   As a contemporaneous purchaser, Micron was damaged by the actions of the Insider Selling Defendants, as alleged in this Complaint, in that (i) in reliance on the integrity of the market, the Company paid artificially-inflated prices as a result of the violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5; and (ii) the Company would not have purchased the securities at the prices it paid, or at all, had it been aware that the market prices had been artificially inflated by Individual Defendants' false or misleading statements.  At the time of the purchase of the securities by the Company, the fair and true market value of the securities was substantially less than the price paid by the Company.

## COUNT V
### INSIDER SELLING AND MISAPPROPRIATION OF INFORMATION
#### (Against Defendants Bailey, Byrne, Johnson, and Switz)

186.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

187.   At the time each of the Insider Selling Defendants sold his or her Micron stock, he or she knew the material, non-public information described above, and sold Micron stock on the basis of such information.

46

188.     The information described above was proprietary, non-public information concerning the Company's business operations, financial condition, and growth prospects.  It was a proprietary asset belonging to the Company, which each of the Insider Selling Defendants misappropriated to his or her own benefit when he or she sold personal holdings in Micron stock. Each of the Insider Selling Defendants knew that this information was not intended to be available to the public.  Had such information been generally available to the public, it would have significantly reduced the market price of Micron stock.

189.     The Insider Selling Defendants' sale of stock while in possession and control of this material, adverse, non-public information was a breach of his or her fiduciary duties of loyalty and good faith.  Each of the Insider Selling Defendants is therefore liable to Micron for insider trading.

190.     Since the use of the Company's proprietary information for personal gain constituted a breach of the fiduciary duties of the Insider Selling Defendants, the Company is entitled to the imposition of a constructive trust on any profits such Insider Selling Defendants obtained thereby.

191.     Plaintiff, on behalf of Micron, has no adequate remedy at law.

## COUNT VI
### WASTE OF CORPORATE ASSETS
### (Against Individual Defendants)

192.     Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

193.     As a noted above, the Individual Defendants caused the Company to repurchase shares of its own common stock at artificially inflated prices, thereby wasting the Company's assets.

47

194.    As a result of this waste of corporate assets, the Company has been damaged and the Individual Defendants are each liable to the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.      Declaring that Plaintiff may maintain this derivative action on behalf of Micron and that Plaintiff is a proper and adequate representative of the Company;

B.      Awarding the amount of damages sustained by the Company as a result of the Individual Defendants' breaches of fiduciary duties and violations of the federal securities laws;

C.      Ordering defendants Bailey, Byrne, Johnson, and Switz to disgorge the profits obtained as a result of their sale of Micron stock while in possession of insider information as described herein;

D.      Granting appropriate equitable relief to remedy Individual Defendants' breaches of fiduciary duties and other violations of law;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees and costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.

48

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: September 17, 2019

Respectfully Submitted,

**COOCH AND TAYLOR, P.A.**

*/s/ Blake A. Bennett*
Blake A. Bennett (#5133)
The Nemours Building
1007 N. Orange Street, Suite 1120
Wilmington, DE 19801
Telephone: (302) 984-3800
Email: bbennett@coochtaylor.com

*Attorney for Plaintiff*

**OF COUNSEL**

**BRAGAR EAGEL & SQUIRE, P.C.**
W. Scott Holleman
Marion C. Passmore
Garam Choe
Alexandra B. Raymond
885 Third Avenue, Suite 3040
New York, New York 10022
Telephone: (212) 355- 4648


**HYNES & HERNANDEZ, LLC**
Michael J. Hynes
Ligaya T. Hernandez
101 Lindenwood Drive, Suite 225
Malvern, Pennsylvania 19355
Telephone: (484) 875-3116

*Attorneys for Plaintiff*